IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 15, 2018

**STATE OF TENNESSEE v. ANTOINE DEWAYNE CLARK**

**Appeal from the Criminal Court for Davidson County**
**No. 2015-D-2592    Monte Watkins, Judge**

_____

**No. M2017-02525-CCA-R3-CD**

_____

A jury convicted the Defendant, Antoine Dewayne Clark, of aggravated arson, and he was sentenced to serve thirty years in prison.  On appeal, he alleges that the trial court erred in limiting defense counsel's questions during voir dire; in allowing testimony regarding the injuries suffered by the victims; in denying a mistrial based on the introduction of evidence that the Defendant was wearing an ankle monitor; and in permitting hearsay testimony.  After a thorough review of the record, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Marie Stacey (at trial and on appeal) and Frank Brazil (at trial), Nashville, Tennessee, for the appellant, Antoine Dewayne Clark.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Glenn Funk, District Attorney General; and Roger Moore, Deputy District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

The evidence at trial showed that the Defendant deliberately set a fire in the hallway of an abandoned hotel outside the door of a room occupied by several homeless individuals.  The State presented evidence that the Defendant was angry with a man he

knew to be inside a fourth-floor room and that he subsequently kindled the fire outside the door of the room, knowing that the man and others would be trapped in the room. Two of those present sought shelter on the balcony but were physically unable to escape until they were rescued by firefighters. The Defendant suggested that the co-defendant, Mr. Joshua Brooks, who testified at trial, was an unreliable witness who may have set the fire himself, noting that those inside the room were unable to see who started the fire.

The Harding Inn, the hotel damaged in the fire, had not been in operation for approximately seven to ten years, and a previous fire had damaged one entrance, leaving it open to the public. When the hotel ceased operating, the contents remained, and many of the rooms were still furnished. Mr. Nish Jobalia was one member of a limited liability company which purchased the property in May 2015, and in July 2015, the owners were attempting to secure the premises to exclude the numerous homeless residents. Mr. Jobalia testified that the building's utilities were not connected and that his company was in the process of beginning to clean up and remodel the building. He was not acquainted with the Defendant or with Mr. Brooks, and he had not given anyone permission to set the building on fire.

Ms. Stacy Craig and Mr. Jonathan Watts were homeless in July 2015 and were living in the Harding Inn. Mr. Watts had lived there approximately one year, and Ms. Craig had lived there for approximately six months. When Ms. Craig moved in, the two relocated to a room on the fourth floor. Ms. Craig testified that while the hotel was generally in bad shape in that it was filled with graffiti and garbage, the room on the fourth floor was furnished and undamaged, although it, like the rest of the hotel, had no utilities. The room had only one entrance. A sliding glass door led onto a balcony, but there was no exit from the balcony.

Ms. Craig was acquainted with the Defendant, whom she knew as "Boo," through a man identified in the record only as "Craig." She had seen the co-defendant, who went by the name "Amy," in passing. On July 7, 2015, Craig, Ms. Craig, Mr. Watts, and a man identified as "Shamon" were in the room shared by Ms. Craig and Mr. Watts. Ms. Craig testified that Mr. Watts was extremely intoxicated, to the point where he could not walk straight. Mr. Watts denied that he was so intoxicated that he could not stand but acknowledged he had consumed six beers and "had a buzz."

Ms. Craig testified that she left the room briefly and saw the Defendant, the co-defendant, and the Defendant's cousin, Ms. Monica Matthews, in a hallway, looking for Craig. Because she was aware that there was a conflict between the Defendant and Craig, she told them that she did not know where Craig was, despite the fact that he was in her room. After Ms. Craig had returned to her room, the Defendant and his companions began shouting through the door, insisting that Craig come out. The security

latch was fastened but allowed the door to be opened a crack, and Shamon cracked the door and told the offenders that it was not Craig's room and that they should leave. The people in the hallway began to shout that they would "burn down the room if [the occupants] didn't come out." Ms. Craig testified that the people in the hallway were cursing, kicking at the door, and threatening to set the room on fire. A person in the hallway was shouting that "he wanted his stuff back." Mr. Watts testified that he was on the balcony but could hear people banging on the door and yelling about a bag. Mr. Watts heard a man say, "I'm going to set this building on fire if you don't give me my bag back." On cross-examination, Ms. Craig acknowledged that she could not identify the Defendant's voice and only assumed that he was one of the individuals in the hallway. She also acknowledged that she did not know who started the fire or what materials were used to start the fire. Mr. Watts likewise acknowledged that he did not see who started the fire but testified that Craig said, "shut up, Boo," to the person outside the door.

After a short period of quiet, the occupants of the room saw smoke coming in under the door. Ms. Craig stated that they tried to open the door but it was "engulfed already." Mr. Watts testified that they tried to open the door but that the doorknob was too hot and smoke was billowing into the room. Ms. Craig went to the balcony, and she saw the Defendant, co-defendant, and Ms. Matthews walking up a hill. She shouted at them, "[W]hy did you do this, we're going to die up here, we have no way down." Ms. Craig testified that the Defendant responded, "I hope you b****es die up there. I hope you burn alive."

Because the Defendant wanted to avoid the introduction of proof that he was wearing an ankle monitor, he entered into a stipulation that he was present at the hotel during the time the fire was set.

The co-defendant confirmed much of Ms. Craig's and Mr. Watts's testimony. The co-defendant testified that he knew Craig and the Defendant as residents of the abandoned hotel and that he had met Ms. Craig in the hallway. At the beginning of the co-defendant's testimony, he stated that he and the Defendant had come to the Harding Inn "to look for Craig to try to find Boo's purse with [Boo's] ankle monitor charger in it." The defense immediately objected to the testimony and moved for a mistrial. The prosecutor stated that the witness had been instructed not to mention the monitoring device. The trial court refused to grant a mistrial, observing, "You had a stipulation and he was instructed not to mention it and it came out. These things happen. I'm not going to grant the mistrial for this one statement, but I will be mindful of any other statements."

The co-defendant testified that on the drive to the hotel, the Defendant had spoken to Craig on the co-defendant's telephone, and the Defendant believed Craig was at the

hotel.  Ms. Matthews joined them after they arrived at the hotel.  They proceeded to hunt for Craig room-to-room.

According to the co-defendant, at one point they "pass[ed]" Shamon and informed him they were searching for Craig in order to recover the purse, but Shamon denied that Craig was in the hotel.  They had seen the room Shamon entered, approached that room, and heard Craig's voice.  The co-defendant peeped through a hole created by a missing doorknob and thought he saw Craig.  He described an argument in which the three in the hallway demanded that Craig come out and the people in the room denied he was there.  According to the co-defendant, the Defendant then said, "I wish I had some gas[;] I'd burn this motherf***er down."  The Defendant began to pile items, including sheets and plastic bags, by the door to the room.  The co-defendant stated there were no large items and that the items consisted entirely of four to five sheets and three to four plastic bags.  The co-defendant stated that he and Ms. Matthews walked down the hallway but that he was able to see "little flames" from the Defendant lighting a plastic bag.  When they left the building, they could see large amounts of smoke, and Ms. Craig began to shout at them.  The Defendant responded to Ms. Craig by saying, "I hope y'all motherf***ers burn alive."  The Defendant left with Ms. Matthews, but they met the co-defendant a short distance away because the Defendant needed to retrieve a purse from the co-defendant's car.  They did not watch the fire or call for help.  The co-defendant denied having had any disagreement with Craig and denied that Craig owed him money.

Ms. Craig testified that all the occupants of the room except for herself and Mr. Watts were able to climb down the balcony to a lower level.  Ms. Craig was physically unable to surmount the railing, and Mr. Watts was too intoxicated.  Ms. Craig testified that she was terrified and thought they would die.  She could see the fire coming out of nearby rooms.  A photograph of the fire shows flames leaping out of several windows on the upper storey of the hotel.  Mr. Watts stated that two people had climbed up the balcony from the third floor to try to open the door to the hallway, but when they were unsuccessful, they climbed back down.

Captain William Nelms of the Nashville Fire Department responded to the fire.  Flames were emerging from several rooms on the top floor, and the firefighters saw two people trapped on a balcony.  Captain Nelms described his decision to use a ladder hooked onto the balcony in combination with another ladder because his longest ladder would not reach the balcony.  He noted that the maneuver risked the lives of the firefighters who rescued Ms. Craig and Mr. Watts because of the possibility that the balcony of the abandoned hotel would give way.  The building suffered damage when the concrete broke apart due to the high temperatures.

Investigator Mark Sells of the Nashville Fire Department testified that he determined the origin of the fire to be in a hallway but testified inconsistently regarding the floor on which the fire originated, stating at different times that it was the second floor, that it was the third floor, that it was the top floor of the building, and that it was not the top floor. There was evidence that the hotel was constructed in a hill and that the number of floors was not consistent throughout the building. Investigator Sells found the remains of approximately ten mattresses, marked by springs, in the hallway, as well as small pieces of linens. He testified that the mattresses would have given off poisonous gases and copious amounts of smoke and that they would have blocked the egress. A match or lighter could have started the fire, and he found no evidence of an accelerant. He stated that four bedsheets and some plastic bags could not have started a fire of that magnitude. Investigator Billy Deering likewise testified that the area of origin was in a fourth floor hallway and that the fire quickly spread to several adjoining rooms. The room that had been occupied was less heavily damaged but had fire and smoke patterns on the walls.

Ms. Craig and Mr. Watts both testified that they were taken to the hospital for smoke inhalation. Investigator Sells interviewed them there, and he testified that they identified the Defendant and co-defendant by their nicknames. The co-defendant was located through his workplace. Investigator Sells and Investigator Deering acknowledged that the co-defendant had given inconsistent statements throughout the investigation. Investigator Deering stated that he interviewed the co-defendant on the night of the fire and that the co-defendant denied any knowledge of the fire. Investigator Sells was present for the co-defendant's second interview, in which he acknowledged having driven to the hotel but denied having entered the hotel. In his third interview, the co-defendant implicated the Defendant in setting the fire. Investigator Sells did not recall if the co-defendant said a lighter was used and denied that the co-defendant asserted repeatedly that only a few sheets and plastic bags and no mattresses were set on fire. The video recording of the interview, which is not included in the appellate record, was played for the jury to demonstrate that the co-defendant had asserted he had not seen any mattresses in front of the door and that Investigator Sells argued with the co-defendant regarding the presence of mattresses piled in front of the door.

The co-defendant acknowledged giving numerous false statements to investigators. When investigators approached him on the night of the fire, he denied any knowledge of the incident. Two days later, he acknowledged that he was near the premises with the Defendant but denied having entered the hotel. In his third statement, made approximately one week after the fire, he acknowledged looking for Craig in the hotel. The co-defendant insisted that the items in front of the hotel room's door consisted of four to five sheets and a few plastic bags. He agreed that after he was asked repeatedly who was responsible for the fire, he eventually responded, "[W]ell, I guess Boo." He

also agreed that he had stated that he and Ms. Matthews had "stuff to lose" while the Defendant did not.

On cross-examination, defense counsel asked the co-defendant, "Did you and Ms. Matthews plot to blame [the Defendant] for this fire?" The co-defendant signaled his attorney, and he was permitted to answer the question out of the presence of the jury. The co-defendant stated that he "wouldn't say that it was a plot. She just was like we cannot go to jail for something that Boo did." He elaborated that Ms. Matthews told him to tell the truth. The court noted that Ms. Matthews's statement would be hearsay, but the prosecutor stated that the State had no objection and would like the statement to come in. Defense counsel objected to the statement and asked that the witness be instructed to give a yes or no answer. The trial court concluded, "And therein that's what puts a little twist in it because of what the jury has heard previously, so he will be allowed to explain." The prosecution noted it had no objection to an instruction that the statement should only be considered for its effect on the co-defendant. The co-defendant testified in front of the jury that Ms. Matthews "said that we cannot go down for something that her cousin did, that we have to tell the truth." The court instructed the jury that Ms. Matthews's statement was "not being offered for the truth of the matter asserted," without further explanation.

The co-defendant acknowledged that he had numerous prior convictions for aggravated robbery and auto burglary and that he was also charged with aggravated arson in the current case. He stated that he was not receiving immunity from prosecution but that he expected "consideration" in the disposition of the charge.

The jury found the Defendant guilty of aggravated arson, and the trial court held a sentencing hearing and sentenced him to serve thirty years in prison. The Defendant appeals his conviction.

## ANALYSIS

On appeal, the Defendant challenges the limitation of voir dire; the introduction into evidence of testimony regarding Ms. Craig and Mr. Watts's injuries; the denial of a mistrial based on testimony regarding the ankle monitor; and hearsay testimony regarding Ms. Matthews's statement that she and the co-defendant should not "go down for something that her cousin did."

### I. Jury Instructions

While the Defendant does not raise the issue on appeal, we are constrained to note an obvious error in the trial court's jury instructions. The Defendant was not required to

object to the jury instructions at trial in order to preserve the issue, but the Defendant has also not raised the issue in the motion for a new trial or on appeal. *See* Tenn. R. Crim. P. 30(b) ("Counsel's failure to object [to jury instructions] does not prejudice the right of a party to assign the basis of the objection as error in a motion for a new trial."). An appellate court, however, retains "the authority to 'consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal.'" *State v. Knowles*, 470 S.W.3d 416, 423 (Tenn. 2015) (quoting Tenn. R. App. P. 36(b)). In *Knowles*, the Defendant raised a challenge to the sufficiency of the evidence but did not challenge the State's improper election of offenses and a related inaccurate jury charge. *Id.* The Tennessee Supreme Court noted that this court erred in applying plenary review after raising the issue *sua sponte*; instead, we should have reviewed for plain error. *Id.* at 422-23; *see also State v. Bishop*, 431 S.W.3d 22, 45 (Tenn. 2014) (noting that an issue raised by Court of Criminal Appeals *sua sponte* should have been reviewed for plain error); *State v. Walton,* 958 S.W.2d 724, 727 (Tenn. 1997) ("[P]lain error is an appropriate consideration for an appellate court whether properly assigned or not.").

For an error to constitute plain error sufficient to merit relief, the following factors must be present:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused did not waive the issue for tactical reasons; and
(e) consideration of the error is necessary to do substantial justice.

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994) (quotation omitted). Additionally, "'the plain error must be of such a great magnitude that it probably changed the outcome of the trial.'" *Bishop*, 431 S.W.3d at 44 (quoting *Adkisson,* 899 S.W.2d at 642). A court need not consider all the factors if it is clear that the defendant will fail to establish at least one. *State v. Jordan*, 325 S.W.3d 1, 58 (Tenn. 2010). An appellate court's *sua sponte* invocation of plain error relief should be exercised sparingly "because 'appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbitrators of legal questions presented and argued by the parties before them.'" *Bishop*, 431 S.W.3d at 44 (quoting *State v. Northern,* 262 S.W.3d 741, 766 (Tenn. 2008) (Holder, J., concurring and dissenting)).

The Defendant here was charged with aggravated arson. The statutory definition of arson is:

(a) A person commits an offense who knowingly damages any structure by means of a fire or explosion:

(1) Without the consent of all persons who have a possessory, proprietary or security interest therein; or

(2) With intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose.

T.C.A. § 39-14-301. The indictment charged the Defendant under subsection (a)(1) with having damaged the Harding Inn by means of fire and without the consent of the owners. Arson becomes aggravated when, as charged here, one or more persons are present in the structure. T.C.A. § 39-14-302. Accordingly, the jury instructions should have charged the jury to find that the Defendant knowingly damaged the structure by means of fire or explosion, without the consent of all the persons who had a possessory, proprietary, or security interest in it, and while one or more persons were present in the structure.

Instead, the written jury charge listed the elements of the offense as follows:

(1) that the defendant knowingly damaged a structure by means of fire or explosion;

and

(2)(a) that the defendant did so without the consent of all persons who have a possessory, proprietary or security interest therein;

or

(b) that the defendant did so with intent to destroy or damage the structure

and

(3)(a) that one or more persons were present therein.

These instructions attempt to include the language from section 39-14-301(a)(2) permitting a finding of guilt when the Defendant acts "[w]ith intent to destroy or damage any structure to collect insurance for the damage or destruction or for any unlawful purpose." T.C.A. § 39-14-301(a)(2). Because the Defendant was only charged in the indictment under subsection (a)(1), having set the fire without the consent of the owners,

the inclusion of this language was itself error. The error is compounded by the fact that the key limiting phrase, requiring a finding that the fire was set with the intent to destroy the property "to collect insurance for the damage or destruction or for any unlawful purpose," is omitted entirely. T.C.A. § 39-14-301(a)(2). A jury following these written instructions could have convicted the Defendant on finding that he knowingly damaged the structure by means of fire; that he acted with the intent to destroy or damage the structure; and that one or more persons were present. In essence, the jury could have convicted the Defendant while omitting one element of the offense, that the Defendant acted without the consent of the proprietors, and substituting a higher mens rea.

The oral instructions given by the judge were also incorrect. The oral instructions were identical to the written instructions in including the language based on Tennessee Code Annotated section 39-14-301(a)(2), despite the fact that the indictment charged the Defendant under subsection (a)(1). Like the written instructions, the oral instructions also omitted the key limiting phrase "to collect insurance for the damage or destruction or for any unlawful purpose." T.C.A. § 39-14-301(a)(2). The oral instructions, however, charged the jury to find *both* that the Defendant set the fire without the consent of all persons who have a possessory, proprietary, or security interest therein *and* that he did so with intent to destroy or damage the structure.

A defendant has a right to a correct and complete jury charge. *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000). The right to a correct and complete charge is constitutional, and each issue of fact raised by the evidence should be submitted to the jury with proper instructions. *State v. Dorantes,* 331 S.W.3d 370, 390 (Tenn. 2011). A jury instruction which misstates an element of an offense so as to lessen the State's burden of proof amounts to constitutional error. *State v. Page*, 81 S.W.3d 781, 789 (Tenn. Crim. App. 2002). Due process requires the conviction to rest upon a jury determination that the defendant is guilty beyond a reasonable doubt of every element of the crime. *State v. Ducker*, 27 S.W.3d 889, 899 (Tenn. 2000). However, "[t]he failure to instruct the jury on a material element of an offense is a constitutional error subject to harmless error analysis." *State v. Faulkner*, 154 S.W.3d 48, 60 (Tenn. 2005); *see Cauthern v. State*, 145 S.W.3d 571, 600 (Tenn. Crim. App. 2004). Such non-structural constitutional error places the burden on the State to prove harmlessness beyond a reasonable doubt. *State v. Rodriguez,* 254 S.W.3d 361, 371 (Tenn. 2008).

Reviewing these instructions for plain error, we conclude that while the record clearly establishes that the jury instructions were erroneous and while this is the breach of a clear and unequivocal rule of law, no substantial right of the Defendant was affected and consideration of the error is not necessary to do substantial justice. Initially, the Defendant is not entitled to relief based on error in the oral instructions because the error in the oral instructions served only to increase the State's burden of proof. Furthermore,

although the error in the written instructions was tantamount to the omission of an element of the offense, the omission of an element of an offense from the jury instructions is harmless beyond a reasonable doubt when that element was not contested at trial and was essentially conceded. *See Garrison*, 40 S.W.3d at 434-35.

In *State v. Ducker*, the trial court neglected to instruct the jury that it must find beyond a reasonable doubt that the victims were under six years of age, an essential element of the crime of aggravated child abuse. *Ducker*, 27 S.W.3d at 898-99. The Tennessee Supreme Court concluded that the error was harmless beyond a reasonable doubt because all of the evidence in the record indicated that the children were under age six and because the defendant did not challenge this element at trial. *Id.* at 899-900; *see Garrison*, 40 S.W.3d at 434-35 (concluding that the error in instructing the jury as to one element of the offense was harmless beyond a reasonable doubt when the element "effectively ha[d] been conceded"); *State v. Tony Martin*, No. W2001-02221-CCA-R3-CD, 2003 WL 261937, at *9 (Tenn. Crim. App. Feb. 7, 2003) (concluding that although mens rea was improperly defined, the evidence at trial overwhelmingly established that the defendant's conduct was knowing and the dispute at trial centered around whether the defendant acted in self-defense). In the case at bar, the Defendant did not contest the fact that he did not have permission to burn the building. All of the evidence at trial supported the conclusion that he was on the premises without the permission of the owners and that the owners did not consent to the kindling of a fire in the hallway. Accordingly, we conclude that the error in the written instructions does not merit plain error relief.

## II. Voir Dire

The Defendant raises as error on appeal the trial court's purported limitation of defense counsel's questioning of the members of the venire during voir dire. The Defendant asserts that he was prevented from asking potential jurors about their charitable contributions, which would have given him insight into any potential bias they might have against him based on his gender identity. However, the Defendant has not included a transcript of voir dire in the appellate record. The appellant has the duty to prepare a record which conveys "a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal." Tenn. R. App. P. 24(b). "When the record is incomplete and does not contain information relevant to a particular issue, this court may not make a ruling." *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993). Instead, in the absence of a transcript, we presume that the trial court's judgments were correct. *Id.* Here, we are not able to ascertain what happened during voir dire, and accordingly the Defendant is not entitled to relief.

### III. Testimony Regarding Injuries

The Defendant asserts that the trial court erred in allowing into evidence statements which showed that Ms. Craig and Mr. Watts were hospitalized for smoke inhalation after the fire. The Defendant filed a motion in limine prior to trial to exclude any evidence regarding injuries sustained during the fire. The trial court ruled that the evidence could come in, concluding, "[I]f they were injured, that's just … part of the facts. Simple as that. So, they can bring that up." The court excluded any evidence that Ms. Craig was pregnant at the time.

The Defendant argues that testimony regarding the injuries does not establish any element of the offense and that it accordingly fails the test of relevancy. He also argues that the prejudicial effect of the evidence substantially outweighed its probative value. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is generally admissible. Tenn. R. Evid. 402. However, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403. Like other decisions regarding the admissibility of evidence, decisions regarding the relevance of evidence are reviewed for abuse of discretion. *State v. Powers*, 101 S.W.3d 383, 395 (Tenn. 2003); *State v. March*, 395 S.W.3d 738, 781 (Tenn. Crim. App. 2011). A court abuses its discretion when it applies an incorrect legal standard or it reaches a decision that is against logic or reasoning and that causes an injustice to the complaining party. *State v. Merriman*, 410 S.W.3d 779, 791 (Tenn. 2013).

To establish that the Defendant committed aggravated arson as charged, the State had to show that the Defendant "knowingly damage[d] any structure by means of a fire or explosion"; that he did so "[w]ithout the consent of all persons who have a possessory, proprietary or security interest therein"; and that one or more persons were present in the structure. T.C.A. §§ 39-14-301, -302. The testimony that Ms. Craig and Mr. Watts suffered from smoke inhalation tended to make the existence of one element of the crime, that one or more persons were present in the building, more probable than it would have been without the evidence. Accordingly, the evidence was relevant. On appeal, the Defendant argues that the evidence should have been excluded because the presence of Ms. Craig and Mr. Watts in the hotel was not disputed. The cumulative nature of the evidence does not, however, render it irrelevant. *See State v. Rogers*, 188 S.W.3d 593, 613 (Tenn. 2006) (noting that evidence which passes the test of relevance may nevertheless be excluded if it is cumulative under Rule 403).

- 11 -

While the Defendant sought to exclude the evidence at trial based on relevance, arguing that it did not establish an element of the offense, he never argued that the evidence should be excluded under Rule 403 because its probative value was substantially outweighed by prejudicial impact due to its cumulative nature. Accordingly, this argument is waived. *See* Tenn. R. App. P. 36(a); Tenn. R. Evid. 103(a)(1); *State v. Howard*, 504 S.W.3d 260, 277 (Tenn. 2016). We nevertheless note that the testimony to which the Defendant objects consists of three passing references to the fact that Ms. Craig and Mr. Watts were hospitalized for smoke inhalation. There were no photographs of the injuries, and there was no medical proof or detailed testimony regarding the nature of the injuries. The prejudicial impact of the passing references would have been minimal. We conclude that there was no abuse of discretion in admitting the evidence.

### IV. Mistrial After Reference to the Ankle Monitor

The Defendant asserts that the trial court erred in refusing to grant a mistrial after the co-defendant testified about an ankle monitor charger contained in the purse which was the subject of the dispute. The State responds that the Defendant has not shown that the trial court abused its discretion in denying the mistrial.

At the time of the offense, the Defendant was wearing an ankle monitor with GPS tracking capabilities due to a prior offense. The Defendant and the State entered into a stipulation prior to trial that the Defendant was on the premises of the Harding Inn at the time the fire was set. This stipulation was intended to prevent the jury from hearing evidence that the Defendant was wearing an ankle monitor. When the co-defendant testified, however, he stated that they had gone to the hotel "to look for Craig to try to find Boo's purse with [Boo's] ankle monitor charger in it." During the jury-out hearing that followed, defense counsel moved for a mistrial. The prosecutor stated that he had instructed the witness not to mention the ankle monitor, and the co-defendant then volunteered that "[t]hat's why the purse was important." The trial court denied the mistrial, acknowledging that the stipulation had been intended to keep the evidence out but concluding that the statement in isolation did not merit declaring a mistrial. Defense counsel was given the option of requesting a curative instruction but made a choice to avoid calling further attention to the testimony.

"The purpose of declaring a mistrial is to correct damage done to the judicial process when some event has occurred which precludes an impartial verdict." *State v. Welcome*, 280 S.W.3d 215, 222 (Tenn. Crim. App. 2007). A mistrial should be declared only upon a showing of manifest necessity; in other words, a mistrial should be declared when a miscarriage of justice would result if the trial were to continue. *State v. Banks*, 271 S.W.3d 90, 137 (Tenn. 2008). The appellant bears the burden of establishing

manifest necessity. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). In evaluating whether the trial court abused its discretion, the appellate court may consider: "(1) whether the State elicited the testimony, (2) whether the trial court gave a curative instruction, and (3) the relative strength or weakness of the State's proof." *Welcome*, 280 S.W.3d at 222. The decision to grant a mistrial lies within the sound discretion of the trial court. *State v. Saylor*, 117 S.W.3d 239, 250 (Tenn. 2003).

Appellate courts have previously upheld a trial court's refusal to declare a mistrial after a passing reference to the defendant's prior imprisonment. *See, e.g.*, *State v. Bell*, 512 S.W.3d 167, 188 (Tenn. 2015) (concluding that the trial court did not err in not declaring a mistrial after two witnesses made brief and unsolicited references to the defendant's prior incarceration, the defendant refused a curative instruction, and the evidence implicating the defendant was strong); *Saylor*, 117 S.W.3d at 251 (holding that the trial court did not err in refusing mistrial based on the admission of a recording in which the words "parole" or "on the run" may have been audible); *State v. Smith*, 893 S.W.2d 908, 923 (Tenn. 1994) (concluding that the trial court did not err in refusing a mistrial when a witness referenced the defendant serving time in jail where the response was unsolicited, the court gave curative instructions, and the proof against the defendant was overwhelming); *Welcome*, 280 S.W.3d at 222 (concluding that the trial court did not abuse its discretion in denying mistrial for a reference to the defendant's incarceration when the reference was brief, was made in an attempt to explain a response, and the trial court had given curative instructions).

Here, the reference to the ankle monitor was brief and isolated, and the jury did not hear any proof regarding the nature of the Defendant's prior offenses. The State did not elicit the testimony and had instructed the witness not to mention the ankle monitor, but the witness disregarded the instruction. Defense counsel was given the option of having curative instructions issued to the jury but chose to avoid putting any further emphasis on the testimony. The State's proof regarding the Defendant's involvement with the crime was strong. Ms. Craig testified that she saw the Defendant and his companions looking for Craig in the hallway and that they subsequently began banging on the door and demanding for him to come out. The co-defendant testified that they were searching for the Defendant's bag, which they believed Craig had stolen. Ms. Craig heard someone in the hallway demanding the return of property, and Mr. Watts heard someone say, "I'm going to set this building on fire if you don't give me my bag back." The co-defendant testified that the Defendant kindled the fire. Ms. Craig and the co-defendant both testified that after leaving the building, the Defendant said that he hoped the people trapped in the room would burn alive. Considering that the testimony was spontaneous, that the Defendant chose to forgo a curative instruction, and that the State's evidence was strong, we conclude that the trial court did not abuse its discretion in denying the motion for a mistrial.

## V. Hearsay Testimony

The Defendant's next assignment of error is that the trial court permitted the co-defendant to testify to a hearsay statement that the Defendant was the perpetrator of the crime. The State responds that the Defendant did not properly preserve this issue and that the statement was not hearsay.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible unless it falls under some exception. Tenn. R. Evid. 802. However, error may only be predicated on the admission of hearsay evidence when there has been a timely objection. *See* Tenn. R. Evid. 103(a)(1) (stating that error may not be predicated on the admission of evidence unless a timely objection or motion to strike was made and a substantial right of the party is affected); Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."). A trial court's factual findings and credibility determinations regarding a ruling on hearsay are binding on the appellate court unless the evidence preponderates against them. *Kendrick v. State*, 454 S.W.3d 450, 479 (Tenn. 2015). This court determines de novo whether a statement qualifies as hearsay or is admissible under one of the hearsay exceptions. *Id.*

The statement at issue was the co-defendant's response to defense counsel's question, "Did you and Ms. Matthews plot to blame [the Defendant] for this fire?" During a jury-out hearing, the co-defendant answered by saying, "I wouldn't say that it was a plot. She just was like we cannot go to jail for something that Boo did." The trial court initially instructed the witness that the statement would be inadmissible as hearsay. The prosecutor noted he had no objection and would like the statement admitted, and defense counsel then asked the court to instruct the witness to give a yes or no answer. The trial court ruled that "because of what the jury has heard previously," it would let the witness answer. The prosecutor noted that the jury could be instructed to consider the statement not for the truth of the matter asserted but only for its effect on the co-defendant. The trial court instructed the jury that the co-defendant would testify about what Ms. Matthews had said but "that since it's hearsay, it's not being offered for the truth of the matter asserted. All right. It will just be what it is. All right." The trial court then permitted the co-defendant to testify that Ms. Matthews "did call me and she said that we cannot go down for something that her cousin did, that we have to tell the truth, that I can't go telling them, that I have to go and tell them the truth about what happened."

The State asserts that the Defendant did not adequately object to the proposed testimony on a hearsay basis. We conclude that defense counsel's request that the witness's response be limited to a yes or no answer, in the context of the discussion regarding hearsay, adequately preserves the issue for review.

Ms. Matthews's statement that the co-defendant should tell the truth is not a hearsay statement but a command. *See State v. Oneal Sanford*, No. E1999-02089-CCA-R3-CD, 2001 WL 681312, at *6 (Tenn. Crim. App. June 18, 2001). The testimony, however, also contains what amounts to an assertion that Ms. Matthews stated that the Defendant committed the crime. This statement, offered to show that the Defendant committed the crime, is hearsay. Although the trial court gave the jury a cursory instruction not to consider what Ms. Matthews said for the truth of the matter asserted, the trial court never explained the instruction or instructed the jury what the statement was being offered to show other than the truth of the matter asserted. *See State v. McCoy*, 459 S.W.3d 1, 11 (Tenn. 2014) (observing that a statement offered to show its effect on the hearer without regard to truth or falsity is not hearsay); *State v. Reece*, 637 S.W.2d 858, 861 (Tenn. 1982) (noting that when evidence was only admitted on the issue of credibility and not for the truth of the matter asserted, the trial court should have instructed the jury to that effect); *see also* 7 Tenn. Prac. Pattern Jury Instr. -- Crim. 42.06.

Nevertheless, we conclude that the trial court did not err in allowing the statement. This is because a hearsay statement becomes admissible when "the defendant himself both elicited and opened the door to the testimony." *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (concluding that there was no error admitting hearsay evidence that a declarant identified the defendant when the defense elicited the testimony). "'[O]pening the door' is an equitable principle that permits a party to respond to an act of another party by introducing otherwise inadmissible evidence." *State v. Gomez*, 367 S.W.3d 237, 246 (Tenn. 2012). This doctrine, also called curative admissibility, "provides that '[w]here a defendant has injected an issue into the case, the State may be allowed to admit otherwise inadmiss[i]ble evidence in order to explain or counteract a negative inference raised by the issue defendant injects.'" *State v. Land*, 34 S.W.3d 516, 531 (Tenn. Crim. App. 2000) (quoting *State v. Armentrout,* 8 S.W.3d 99, 111 (Mo. 1999)); *see also State v. Bennie Edward Jackson*, No. M2016-02575-CCA-R3-CD, 2017 WL 4457597, at *7 (Tenn. Crim. App. Oct. 5, 2017) (noting that a witness's testimony regarding prior assaults was elicited by the defense and that the defense did not request curative instructions), *perm. app. denied* (Tenn. Feb. 14, 2018). In order to "open the door," the party against whom the evidence is offered must introduce the matter or put the matter at issue. *Gomez*, 367 S.W.3d at 246. The evidence admitted must be relevant to the same subject matter as the evidence introduced by the party against whom it is offered. *Id.* at 247-48.

- 15 -

Here, the defense asked the co-defendant if he and Ms. Matthews had "plot[ted]" to blame the Defendant for the crime. The co-defendant's answer asserted that while the two did discuss blaming the Defendant, the discussion was not a plot to frame him but a decision to tell the truth. The question itself called for the co-defendant to testify regarding out-of-court statements exchanged with Ms. Matthews. Accordingly, we conclude that the trial court did not abuse its discretion in permitting the witness to answer the question.

## VI. Cumulative Error

Insofar as the Defendant asserts he is entitled to relief for cumulative error, we have concluded that neither the hearsay statement nor the testimony regarding injuries was admitted in error, that the trial court did not abuse its discretion in denying a mistrial, and that the jury instructions do not constitute plain error. The Defendant is not entitled to relief. *See State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010).

## CONCLUSION

Based on the foregoing reasoning, we affirm the trial court's judgment.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE